## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| CURT BROCKMANN, et al., )<br><br>Plaintiffs, )<br><br>vs. )<br><br>THE BOARD OF COUNTY )<br>COMMISSIONERS OF THE )<br>COUNTY OF SHAWNEE, and )<br>SEWER DISTRICT 74, )<br><br>Defendants, )<br>and )<br><br>GENERAL CASUALTY INSURANCE )<br>COMPANY OF WISCONSIN, )<br><br>Garnishee. )<br>_____ ) | Case No. 07-4103-EFM |

## MEMORANDUM AND ORDER

This matter now comes before the Court on Garnishee General Casualty Insurance

Company of Wisconsin's ("Garnishee" or "CICW") Motion for Summary Judgment (Doc. 47),

Plaintiffs Curt Brockmann, et al. Motion for Summary Judgment (Doc. 48), and Garnishee's

Motion to Assess Attorneys' Fees (Doc. 41). The Court has thoroughly reviewed the record

provided and the applicable law. For the reasons stated below, Garnishee's Motion for Summary

Judgment is granted, Plaintiffs' Motion for Summary Judgment is denied, and Garnishee's

Motion for Attorneys' Fees granted in part and denied in part.

## I.      FACTS

The following facts are either uncontroverted or taken in the light most favorable to the

non-moving party.

The Board of County Commissioners for Shawnee County, Kansas ("Shawnee County")

is in charge of a number of sewer systems throughout the county.  Of those sewer systems, Sewer District 74 operates in a Southwest section of Topeka, Kansas, generally the Lake Sherwood neighborhoods.  Sherwood Park Development LLC ("Sherwood Development"), operates Sewer District 74.  On January 13, 2005, Shawnee County entered into a contract with Bartlett & West Engineers, Inc. ("Bartlett") for Bartlett to provide construction engineering services for various Shawnee County projects dealing with bridges, roads, and sewers on an on-call basis.  On behalf of Sherwood Park Development, Bartlett, on May 9, 2005, sent L.P.'s Excavating Inc. ("L.P.'s"), an invitation to bid on certain sewer projects in the Lake Sherwood area.  The invitation agreement provided that the project was a developer financed project and that the owner is Shawnee County or its representatives.  L.P.'s submitted its bid to Sherwood Development, which was accepted on May 20, 2005.

Work on the sewer system began in July with Bartlett's field representative assuring that the project followed Shawnee County specifications.  The job entailed attaching additional sewer pipes to the established sewer system extending from Shawnee County.  On August 11, 2005, Shawnee County contacted Bartlett to have L.P.'s remove the new pipes already installed because it did not use erosion control pipes while attaching the extension according to Shawnee County project specifications.  L.P.'s began installing the erosion control pipe by August 16, and on August 17, L.P.'s installed a plug in the newly installed pipe to prevent dirt and water from flowing into the existing sewer system.  The air plug was tested and deemed acceptable by Bartlett's on-site field representative.

On August 19, 2005, a severe rain storm moved into Topeka and caused flooding in the cavity left at the work site.  The newly extended pipe was infiltrated, creating increased pressure

to the main sewer system that led to an overflow of sewage in the system.  This overflow led to the failure of the sewage pump in the Sherwood park area and caused flooding to a number of homes in the vicinity.  Most of the homeowners affected by the flood submitted to Shawnee County their demand letter pursuant to K.S.A. § 12-105(b) on April 21, 2006.  In the letter, Plaintiffs claimed that Shawnee County was negligent for failing to meet its standard of care in plugging the sewer system, and for nuisance created by the flooding to their homes.[1]  Plaintiffs demanded nuisance damages, negligence damages, stigma damages, and damages for personal injury.  The only part of the letter identifying L.P.'s was the first sentence of the uncontroverted facts stating that "LP [sic] Excavating with the knowledge of a Shawnee County sewer employee dug a trench in Sherwood Park Subdivision No. 8."

Plaintiffs sent an additional letter to Shawnee County on May 3, 2006, informing it that L.P.'s was insured under a policy held with CICW.  In the letter, Plaintiffs informed Shawnee County that an offer to settle the claims for $2 million would be held open for thirty days.  Shawnee County did not provide CICW with Plaintiffs' settlement offer.[2]  In response to the May 3, 2006 letter, though after the settlement offer deadline but prior to Plaintiffs filing suit, Shawnee County drafted a letter dated June 30, 2006 that notified CICW of damages Plaintiffs sustained in an incident involving CICW's insured, L.P.'s.  Shawnee County requested information about the policy held by L.P.'s, and further stated that the letter would "serve as a written demand . . . for a defense and payment of any claims related to this incident asserted

---

[1] In their letter, Plaintiffs cited to a number of cases predating the Kansas Tort Claims Act (KTCA), but fail to make mention of the KTCA.

[2] Doc. 52-15, p. 55.

against Shawnee County as a result of the negligence of [L.P.'s]."[3]  After receiving the letter, Larry Seuferer, CICW's corporate counsel for claims, took steps to learn about the underlying case, and determined that venue was in Kansas.[4]  Mr. Seuferer then hired Stephen D. Manz as outside coverage counsel to act on its behalf and to conduct "whatever investigation was appropriate" under Kansas law and to provide CICW with a coverage opinion.[5]  CICW did not respond to Shawnee County's June 30, 2006 letter until October 23, 2006, after a second demand letter, discussed below, was also received.

During the interim, on August 24, 2006, Plaintiffs Angie and Curt Brockmann filed their petition in state court ("state court petition") claiming that the "flooding was caused by the negligence of defendant L.P. [sic] Excavating by failing to meets its standard of care in closing off the sanitary sewer system . . . and defendant Shawnee County, in failing to properly plan, inspect, maintain, repair, or upgrade as necessary, the sanitary system . . . so as to accommodate sewage without infiltrating the Brockmann's home."[6]  Plaintiffs further claimed that Shawnee County was "negligent for failing to act upon the negligence of L.P.'s Excavating."[7]  On September 21, 2006, Shawnee County sent Plaintiffs a letter that it intended to send to CICW, which was re-dated and sent to CICW the next day.   Attached to the September 22, 2006 letter

---

[3]Doc. 47-15, p.5.

[4]Doc. 52-10, pp. 15-16.

[5]Doc. 52-10, pp. 15-17, 59.  Section I, Coverages, of the insurance contract sets forth CICW's option to investigate any claim or suit, at its discretion, to determine if insurance coverage applies to the claim so as to implicate CICW's duty to defend.

[6]Doc. 52-10, pp. 17-18.

[7]Doc. 47-11 p. 3 ¶ 7.

was a copy of the state court petition.[8]  In that letter, Shawnee County stated that the lawsuit "related to the negligence of your insured, LP [sic] Excavating," and reiterated its request for coverage and a defense using language identical to its original request.[9]  CICW's counsel forwarded the June 30, 2006 and September 22, 2006 letters along with the state court petition to coverage counsel, Stephen Manz.

In investigating Plaintiffs' claim, Mr. Manz reviewed the petition and the first amended petition, the insurance policy, information developed by an independent adjustor, Plaintiffs' demand letter to the City of Topeka and the informal allegations contained therein, and the investigation conducted by L.P.'s counsel, Larry Pepperdine.[10]  Mr. Manz formed the opinion that, based on Kansas law, there was no agency relationship between Shawnee County and L.P.'s, and accordingly, there was no claim asserted against Shawnee County that could cause it to become liable for L.P.'s actions.[11]

On October 23, 2006, Mr. Manz informed Shawnee County that Plaintiffs' claims did not give rise to coverage under the policy, and therefore, CICW declined to defend the action. CICW reasoned that the policy was limited in that it did not provide coverage for "any liability due to negligence attributable to any person or entity other than the Named Insured."  Thus, because the petition alleged that Shawnee County was negligent for its own actions rather than

---

[8]Plaintiffs filed a First Amended Petition on September 15, 2006, which merely corrected the spelling of Plaintiff Curt Brockmann's first name.  Doc. 47-11, pp. 6-9.

[9]Doc. 47-17, p. 8.

[10]Doc. 47-5, p. 4 ¶¶ 3-5.

[11]Doc. 47-5, p. 4-5.

for the acts of L.P.'s, the letter concluded no coverage was provided.[12]  CICW, however, qualified the denial by informing Shawnee County that if it was aware of any facts, allegations, or documents that would establish coverage under the policy, CICW would "reevaluate its position and make further analysis of all information known to [Shawnee County] or any other party in the case that has bearing on the issue of coverage."[13]  CICW further stated that should new information become available in the future, it would also reassess its position.

After Shawnee County received CICW's letter denying coverage, Shawnee County communicated CICW's decision to Plaintiffs' counsel, Larry Leatherman.  Mr. Leatherman's response to Shawnee County was that he disagreed with CICW's analysis not to defend "because [CICW does] not believe [Shawnee County is] liable for the conduct of L.P. Excavating's actions."[14]  Mr. Leatherman also notified Shawnee County of Plaintiffs' intention to move the court to add additional plaintiffs.[15]  Nearly one month later, on December 5, 2006, Shawnee County informed CICW by letter that Plaintiffs believed Shawnee County would be "held responsible for the negligence of L.P.'s Excavating," and also notified CICW of Plaintiffs' intent to add additional Plaintiffs to the action.[16]  On December 8, 2006, Mr. Manz, on behalf of CICW, responded by requesting a copy of the amended petition and informed Shawnee County of CICW's willingness to reevaluate its previous coverage decision.[17]  Shawnee County did not

---

[12]Doc. 52-12.

[13]Doc. 52-12, p. 4.

[14]Doc. 47-17, p. 20.

[15]Doc. 47-17, p. 21.

[16]Doc. 47-17, p.22.

[17]Doc. 47-17, p. 44.

respond to Mr. Manz' letter until June 15, 2007, one month before trial.

On December 6, 2006, Plaintiffs' attorney sent a letter to Shawnee County detailing, among other matters, a proposed Covenant Not-to-Execute against Shawnee County.  As part of the proposed agreement, Shawnee County would pay Plaintiffs $200,000 and assign its rights under the CICW policy to Plaintiffs in exchange for the covenant not-to-execute.  In addition, Shawnee County would permit entry of judgment with the agreement not to contest any evidence offered by Plaintiffs, and it would not submit any evidence on its behalf.[18]  It further provided that if Plaintiffs are successful in obtaining a judgment against CICW, Shawnee County would receive "first dollar reimbursement" to any settlement with CICW, and Plaintiffs also would pursue Shawnee County's attorneys fees and litigation costs.[19]  The proposed covenant, however, required Shawnee County to join Plaintiffs in opposing any attempt by CICW to intervene or participate in the action.[20]  The agreement further required the parties to maintain secrecy of the covenant, with limited exception.[21]

A draft journal entry of judgment was also attached to Plaintiffs' letter for Shawnee County's review.[22]  The draft stated that all parties were prepared for trial, but that L.P.'s introduced no evidence and that Shawnee County introduced no evidence.  It further provided

---

[18]Plaintiffs prepared a draft Journal Entry of Judgment, which Mr. James Crowl, Assistant Shawnee County Counselor, signed on behalf of Shawnee County, listing damage amounts and percent of liability.  Doc. 2-4, pp. 12-25.

[19]Doc. 47-17, p. 28, ¶¶ 3-4.

[20]Doc. 47-17, pp. 27-31.  Specifically, the proposed agreement stated that "[t]he parties agree that they will oppose any attempt by General Casualty in *Curt Brockmann and Angie Brockmann, et al. v. LP* [sic] *Excavating and Shawnee County*, Case No. 06 C 1291 and will not cooperate with General Casualty on any attempt to intervene or participate in said litigation."  Doc. 47-17, p. 29 ¶ 5; *see also* Doc. 47-17, p. 28, ¶ 5.

[21]Doc. 47-17, p. 30, ¶ 9.

[22]Doc. 47-17, pp. 32-43.

that "[d]efendant Shawnee County has notified General Casualty that Plaintiff alleges the county is responsible for the negligence of L.P. Excavating." The proposed journal entry would award nuisance damages, stigma damages, and actual damages. In rendering the judgment, the proposed journal entry relied on *Davis v. Kansas City*[23] and provided that L.P.'s was 70% at fault and that Shawnee County was 30% at fault for the flooding of plaintiffs' homes and resulting damage. The draft journal entry awarded $1,699,414.40 in damages, ordering that Shawnee County pay $1,189,608 due to L.P.'s negligence, and $509,832.30 due to its own negligence. Neither Shawnee County nor Plaintiffs provided CICW with a copy of the agreement not-to-execute or the proposed journal entry of judgment.[24]

Also on December 6, 2006, Plaintiffs' attorney sent a letter to Mark and Kim Daugherty, potential Plaintiffs in the action, detailing the plans for the Covenant Not-to-Execute. The letter provided:

> As I have explained to each of you the County itself is not insured. The County has a policy of insurance as an additional insured issued by General Casualty Insurance, a copy of which was previously provided. In order to trigger that insurance the County must be responsible for the negligence of LP [sic] Excavating. Because our damages without insurance would be capped against the County at $500,000 I believe it is better to release the County itself and to pursue the claim directly against General Casualty.
>
> Many of you have asked what I believe the percentage chance of winning this issue and I have indicated 80%. I still believe that to be true. If we are able to enter this Covenant Not-to-Execute and the journal entry is signed by the judge we will have gained significant leverage with regard to the insurance coverage.
>
> The risk is that General Casualty will later say that because we released LP [sic] Excavating we did not have a cause of action against Shawnee County for the

---

[23]204 Kan. 524, 464 P.2d 154 (1970). In *Davis*, the Kansas Supreme Court held that where a municipal agency retains control of an independent contractor through specific provisions in a contract as to the manner and method of the contractor's work, the municipality may be vicariously liable for the independent contractor's negligence. *Id.* at 524, 464 P.2d at 160.

[24]Doc. 52-15, p. 88.

negligence of LP [sic] Excavating.  I have researched this issue and believe that two things are true. Our first defense to this is that they cannot attack the underlying judgment as that they did no show up to raise that issue in the underlying judgment. This is our best defense.

As a secondary defense there is case law, specifically *Mulroy v. Olberding*, which supports the continuation of a case for the negligence of an agent under the vicarious liability laws of the State of Kansas.  There is, however, contrary law which itself is identified in the *Mulroy* case which would indicate that the claim is extinguished.  Should a court determine that the claim is extinguished by our release to LP [sic] Excavating we would have no claim at that time against the County.[25]

Subsequently, Plaintiffs entered into negotiations with L.P.'s and CICW to settle the claims against L.P.'s.  Plaintiffs also began negotiations with Shawnee County.  The parties agreed that Plaintiffs would release their claims against L.P.'s .  The Releases provided that for:

valuable consideration in hand paid by LP's [sic] Excavating, Inc., and General Casualty Company of Wisconsin, the receipt whereof is hereby acknowledged, have remised, released, and forever discharged, and by these presents do for themselves and for their children, their heirs, executors and administrators, remise, release, and forever discharge LP's [sic] Excavating, Inc., its officers, directors, agents and employees, and its successors and assigns, of and from any, and all manner of action and actions, cause and causes of actions, suits, damages, judgments, executions, claims and demands whatsoever, in law or in equity, which against LP's [sic] Excavating, Inc., the said [Plaintiffs], as a result of an incident which occurred on or about August 19, 2005, resulting in sewage backup into their residence at [plaintiff's respective addresses], ever had, now have or which they, their children, their heirs, executors or administrators, hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever.[26]

The Releases were negotiated and signed throughout December 2006 and January 2007.  On the basis of these Releases, a journal entry was entered on February 5, 2007, dismissing L.P.'s from the case.

On May 22, 2007, Plaintiffs filed their second amended petition, adding a number of Plaintiffs and changing the named defendant from L.P.'s and Shawnee County to Shawnee

---

[25]Doc. 47-17.

[26]Doc. 47-18.

County and Sewer District 74.  The amended petition claimed that the "flooding was caused by the negligence of L.P. [sic] Excavating by failing to meet its standard of care in closing off the sanitary sewer system at Sherwood Park Subdivision 8 . . . and therefore defendants Shawnee County and Sewer District 74 in failing to properly plan, inspect, maintain, repair, or upgrade as necessary, the sanitary sewer system serving Plaintiffs' homes . . . ."  Shawnee County filed its answer to Plaintiffs' second amended petition on June 11, 2007, alleging, among other defenses, that it was immune from liability under the Kansas Tort Claims Act and that other parties were comparatively at fault.[27]

Not until June 15, 2007, after it had already filed its answer, did Shawnee County send a letter, a copy of the amended petition, and its answer to CICW.[28]  The letter provided that a pretrial conference was scheduled for July 2, 2007, and that trial would commence on July 18, 2007.  In addition, Shawnee County demanded that CICW provide coverage and defense under the policy.  In response to this letter, on June 29, 2007, CICW faxed a letter to Shawnee County detailing its willingness to provide a defense under reservation of rights while again emphasizing its belief that coverage still may not exist for the accident.[29]  CICW retained Richard Honeyman to defend Shawnee County in the action.[30]  Between June 29 and July 3, 2007, CICW learned that Shawnee County was preparing to enter into an agreement with Plaintiffs whereby Plaintiffs would agree not to execute against the County for the right to pursue CICW.  In a letter dated

---

[27]Doc. 47-11, pp. 14-16.

[28]Doc. 47-17, p. 48.

[29]Doc. 47-17, pp. 59-66.

[30]Doc. 47-17, p. 63.

July 3, 2007, CICW reaffirmed its offer to provide a defense, and also indicated its objection to

any agreement where Shawnee County would concede or confess judgment and waive its

defenses.  The letter stated in part:

> As you know, General Casualty Company has agreed to defend Shawnee County in the above lawsuit under the terms of a reservation of rights which was forwarded to you on June 29, 2007.
>
> It has now come to our attention that Shawnee County may be preparing to enter into an agreement with the Plaintiffs in the nature of an assignment of rights and a Covenant Not-to-Execute against the County. . . .  Further, it is my understanding that the County does not intend to actively defend the claims against it but rather intends to allow judgment to be entered against the County based on Plaintiffs evidence alone and the County does not intend to seek a comparison of fault with parties and non-parties pursuant to KSA 60-258a.
>
> This is to advise Shawnee County that General Casualty Company reiterates its offer to defend the County in the above lawsuit under the terms of the reservation of rights letter that was sent to you on June 29, 2007. However, General Casualty Company does not acquiesce in the County entering into an assignment of rights and Covenant Not-to-Execute, or any other agreement under any title whereby the County concedes or confesses judgment or fails to defend or takes an inactive or passive position concerning the defense of the claims against it.[31]

The Board of County Commissioners approved the Covenant Not-to-Execute and assignment of

rights on July 5, 2007.[32]  Shawnee County subsequently declined CICW's offer to defend it in

the pending action.[33]

On July 18, 2007, the case was called for bench trial before the Honorable Larry D.

Hendricks of the Shawnee County District Court, where Plaintiffs pre-admitted exhibits and

---

[31]Doc. 47-17, p. 67.

[32]Doc. 52-15, pp. 112.  The Assignment of Rights and Covenant Not-to-Execute approved by the Board of County Commissioners and submitted to the court as exhibit 25 differs from the December 2006 proposed Covenant Not-to-Execute in that paragraph 5, in which the parties agreed to oppose and not cooperate with General Casualty on any attempt to intervene or participate in the action, had been removed.  *Compare* Doc. 53-3, pp. 1-3 *with* Doc. 47-17 pp. 29-31.

[33]Doc. 52-15, pp. 118-19; *see also* Doc. 47-17, p. 71.

presented limited testimonial evidence on damages.  Shawnee County, consistent with its

Covenant Not-to-Execute with Plaintiffs and their proposed journal entry of judgment, presented

no evidence nor cross-examined any witness.  The court found that L.P.'s was negligent in

failing to close off the sewer line at the end of the workday on August 18, 2005, and that

Shawnee County was negligent in failing to maintain and inspect the sewer lines servicing the

Sherwood area.  The court awarded damages in accord with the party's proposed journal entry of

judgment and the party's stipulated damage grid, admitted as trial exhibit 29, minus amounts for

personal injury damages, which Plaintiffs withdrew.[34]  L.P.'s and Shawnee County were

adjudged liable for negligence damages, nuisance damages, and stigma damages in the amount

of $2,831,600.  L.P.'s was found 70% liable and Shawnee County was found 30% liable.  The

court ordered that Shawnee County pay $1,982,120 due to L.P.'s negligence, and $849,480 due

to its own negligence.  Plaintiffs then attempted to collect the judgment from CICW through a

garnishment action in state court, which CICW subsequently removed to federal court based on

diversity jurisdiction.

## II.  SUMMARY JUDGMENT STANDARD

The Court is familiar with the standards governing the consideration of Summary

Judgment.  Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."[35]  A fact is material under this standard only if a dispute over it would affect the

---

[34]Doc. 47-15, pp. 122-23; *see also* Doc. 2-2, p. 24, Doc. 53-4.

[35]Fed. R. Civ. P. 56(c).

outcome of the suit.[36]  An issue is genuine only if it "is such that a reasonable jury could return a verdict for the nonmoving party."[37]  The inquiry essentially determines if there is a need for trial, or whether the evidence "is so one-sided that one party must prevail as a matter of law."[38]

The moving party bears the initial burden of providing the court with the basis for the motion and identifying those portions of the record that show the absence of a genuine issue of material fact.[39]  "A movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[40]  The burden may be met by showing that there is no evidence to support the nonmoving party's case.[41]  If this initial burden is met, the nonmovant must then "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[42]  If the moving party bears the burden of proof at trial, "it must point to evidence in the record that supports its version of all material facts and demonstrate an absence of a genuine issue of material facts."[43]  "If the moving party does not meet this burden, the court must deny summary judgment even if the nonmoving party does not produce any opposing evidence."[44]  If the moving party does meet its

---

[36]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[37]*Id.*

[38]*Id.* at 251–52.

[39]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[40]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp.*, 477 U.S. at 325).

[41]*Id.*

[42]*Id.*

[43]*Celotex Corp.*, 477 U.S. at 331 (Brennan, J., dissenting).

[44]*Id.*

burden, the nonmoving party must offer more than mere allegations and denials to create a genuine issue of material fact.[45]  When examining the underlying facts of the case, the Court is cognizant that it may not make credibility determinations or weigh the evidence.[46]  Furthermore, the record is to be viewed in the light most favorable to the nonmoving party.[47]

## III.  JURISDICTION

The Court has jurisdiction over this garnishment action pursuant to 28 U.S.C. § 1332. This action is a separate and independent claim from the state court action, and is properly before this Court.[48]

## IV.  ANALYSIS

### A.    Bad Faith Denial of Coverage and Defense

Plaintiffs assert that CICW breached its duty to defend under the terms of the insurance contract when it denied Shawnee County both coverage and a defense on October 23, 2006. Plaintiffs contend that they provided CICW over a year's notice that they intended to make a claim that Shawnee County was vicariously liable for L.P.'s negligence, citing Shawnee County's initial June 30, 2006 letter requesting defense and a copy of the insurance policy. Accordingly, Plaintiffs claim CICW acted in bad faith in the denial because it failed to conduct a reasonable investigation to determine whether the claim might fall within the insurance coverage before declining to defend.  CICW argues that it conducted a good faith investigation into the

---

[45]*Id.*

[46]*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

[47]*Harrison v. Wahatoyas, LLC*, 253 F.3d 552, 557 (10th Cir. 2001).

[48]*See Smotherman v. Caswell*, 755 F. Supp. 346, 348 (D.Kan. 1990).

claim and did not act in bad faith in denying to defend.  The insurance contract only covers Shawnee County for the vicarious liability of Shawnee County with respect to L.P.'s, and neither the claim made nor the facts of the event would give rise to such liability to this governmental entity.  Therefore, CICW contends that it is not liable for Shawnee County's state court judgment.

### 1.      Coverage under the contract

The Court must first determine whether Shawnee County was covered under the insurance contract.  Where there is no coverage under an insurance contract, the insurer has no duty to defend.[49]  The interpretation and construction of an insurance contract, including the determination of whether policy language is ambiguous, are questions of law.[50]  Under Kansas law, "if the language of the insurance policy is clear and unambiguous, it must be construed in its plain, ordinary, and popular sense and according to the senses and meaning of the terms used."[51]  A policy is ambiguous "when it contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language," but a term is not ambiguous merely because the parties disagree about its interpretation.[52]  "Ambiguity in a written contract does not appear until the application of the pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning."[53]  The

---

[49]*Ramsey v. Lee Builders, Inc.*, 32 Kan. App. 2d 1147, 1154, 95 P.3d 1033, 1038 (2004).

[50]*See, e.g., Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 709, 89 P.3d 573, 576 (2004).

[51]*Kemper Ins. Cos. v. Weber*, 38 Kan. App. 2d 546, 551, 168 P.3d 607, 610 (2007).

[52]*Id., 168 P.3d at 610.*

[53]*Am. Family Mut. Ins. Co. v. Wilkins*, 285 Kan. 1054, 1058-59, 179 P.3d 1104, 1109-10 (2008) (quoting *O'Bryan v. Columbia Ins. Grp.*, 274 Kan. 572, 56 P.3d 789 (2002)).

test is "not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean."[54]  This does not, however, mean that an insurance contract is construed "according to the insured's uninformed expectations of the policy's coverage."[55]

Using these standards, the Court finds as a matter of law that there is no ambiguity in the Contractor's Additional Insured Endorsement of the insurance contract between CICW and L.P.'s in that Shawnee County is an additional insured.  Further, the policy clearly limits Shawnee County's coverage to the liability imputed to it from L.P.'s negligence, and does not provide coverage for the negligence of Shawnee County itself or any other party.[56]  Therefore, absent a claim that Shawnee County is liable for the negligence of L.P.'s, there is no coverage under the contract.[57]

[54]*Id.* at 1059, 179 P.3d at 1110 (quotation omitted).

[55]*Marshall v. Kan. Med. Mut. Ins. Co.*, 276 Kan. 97, 111, 73 P.3d 120, 130 (2003).

[56]The policy states that Shawnee County's coverage is limited to the "liability due to [Shawnee County's] negligence specifically resulting from '[L.P.'s] work for [Shawnee County] which is the subject of the written contract or written agreement.  No coverage applies for any liability due to the negligence attributable to any person or entity other than [L.P.'s]."

[57]A bench trial was conducted July 18, 2007, in the Shawnee County District Court, where the court concluded that L.P.'s was under the indirect control of Shawnee County through Bartlett & West, and "since L.P.'s acted as an agent of its principle [sic], Shawnee County, the Doctrine of Respondeat Superior applies."  Transcript of Record at 122, *Brockmann et al., v. Bd. of County Commr's of Shawnee County*, Shawnee County District Court No. 06-C-1291.  The state court provided very little analysis with regard to its decision.  The Court notes that while the contract between Shawnee County and Bartlett & West Engineering was submitted as one of many exhibits at the beginning of trial, there was no testimony regarding this contract or the contract between Bartlett & West and L.P.'s.  The only testimony relating to Shawnee County's control over L.P.'s so as to impute vicarious liability came from a homeowner who, as a business owner, had been contracted by Shawnee County on previous unrelated projects in which the homeowner testified Shawnee County had exerted control over *his* actions.  In addition to this homeowner's testimony, Plaintiffs submitted as trial exhibit 24 the deposition of Larry Grochowsky, a field representative for Bartlett & West Engineering.  Mr. Grochowsky did not testify during the trial, but during his deposition, his testimony with regard to Shawnee County's control over the project was only that the project proceeded according to Shawnee County specifications, and that he "believed it was Shawnee County that said he had to remove [the nonconforming sewer pipe]."  Doc. 47-13, p. 48 (Deposition of Larry Grochowsky).  Nevertheless, the state court found Shawnee County vicariously liable for L.P.'s actions.  The Court, however, will view the case as it appeared at the time of the request for coverage and not in light of the ultimate outcome in state

### 2.      Bad faith/unreasonable investigation

Plaintiffs assert that CICW acted in bad faith in denying Shawnee County's request for a defense on October 23, 2006, and therefore, should be liable for the entire judgment rendered in state court.  In support of their claim, Plaintiffs contend, among other arguments, that CICW failed to conduct a reasonable investigation prior to its decision to deny Shawnee County a defense, alleging it failed to look beyond the pleadings and consider facts either brought to its attention or which it could reasonably discover to determine whether it had a duty to defend.[58] As a result, CICW should be liable for the entire judgment, including that portion in excess of policy limits.  CICW argues that it conducted a reasonable investigation by hiring outside coverage counsel familiar with the requirements of Kansas law to investigate the incident and provide CICW with a coverage opinion.  CICW further posits that the investigation encompassed more than just the pleadings, that there is no law requiring CICW employees to conduct a review independent of hired coverage counsel's investigation.  Finally, its coverage denial was the result of a good faith analysis of the law as applied to the facts and allegations at the time of Shawnee County's request for coverage.

As general rule, a finding of bad faith is required to hold an insurer liable for a settlement or judgment in excess of its policy limits.[59]  "The conduct of the insurer must not be viewed through hindsight.  Instead, the offer and strength of the plaintiff's case must be viewed as they

---

court.  *See Snodgrass v. State Farm Mut. Auto. Ins. Co.*, 15 Kan. App. 2d 153, 167, 804 P.2d 1012, 1023 (1991) *review denied* Mar. 12, 1991.

[58]Doc. 49, p. 11; Doc. 52, pp. 36-37.

[59]*Snodgrass*, 15 Kan. App. 2d at 166, 804 P.2d at 1022; *see also Glenn v. Fleming*, 247 Kan. 296, 305, 799 P.2d 79, 85 (1990) (stating "[a]n insurance company may become liable for an amount in excess of its policy limits if it fails to act in good faith and without negligence when defending and settling claims against its insured.").

fairly appeared to the insurer and its agents and attorneys at the time the [request to defend] was refused . . . .  Something more than mere error of judgment is necessary to constitute bad faith."[60] When evaluating a coverage decision, an insurer "must look beyond the effect of the pleadings and consider any facts brought to its attention or any facts which it could reasonably discover" and conduct a good-faith analysis based on the learned information.[61]  An insurer, however, is not required to defend actions brought wholly outside policy coverage or where an insurer would have no liability if the plaintiff secured a judgment against the insured.[62]

The insurer's duty to defend does not arise under the policy until the additional insured provides the insurer with written notice of a claim or suit, or notice of an occurrence that may result in a claim or suit.[63]  Shawnee County first provided notice to CICW of Plaintiffs' claims in its June 30, 2006 letter regarding the incident involving CICW's insured, L.P.'s.  Although Shawnee County's request for coverage and defense in this initial demand letter was prior to Plaintiffs' filing suit, it did eventually provide the petition as an attachment to its September 22, 2006 letter to CICW in which Shawnee County reiterated its request for coverage and defense using language identical to that in its original letter.[64]  CICW denied Shawnee County coverage and a defense on October 23, 2006.

---

[60]*Snodgrass*, 15 Kan. App. 2d at 167, 804 P.2d at 1023 (citing *Glenn*, 247 Kan. at 305, 799 P.2d at 85-86).

[61]*Patrons Mut. Ins. Co. v. Harmon*, 240 Kan. 707, 710, 732 P.2d 741, 744 (1987).

[62]*Id.* at 710, 732 P.2d at 744.

[63]Doc. 47-6, pp. 23-24.  "Suit" and "occurrence" are defined terms under the policy.  A "suit" means "a civil proceeding in which damages because of . . . 'property damage' . . . to which this insurance applies are alleged."  An "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

[64]Doc. 47-17, p.8.

The record reflects that no communication took place between CICW and Shawnee County from October 23, 2006, until December 5, 2006, when Shawnee County informed CICW of Plaintiffs' intent to add additional Plaintiffs and of Plaintiffs' counsel's discord with CICW's liability analysis.

The record before the Court is void of any support for a claim of bad faith on the part of CICW in denying coverage and a defense to Shawnee County.  Plaintiffs assert that CICW acted in bad faith pursuant to the standard set forth in *Robinson v. State Farm Fire & Casualty Company*.[65]  Kansas courts have adopted the *Robinson* standard in *Associated Wholesale Grocers, Inc. v. Americold Corporation*.[66]  The *Robinson* standard establishes several factors for evaluating the circumstances surrounding an insurer's coverage denial, which include: (1) whether the insured was able to obtain a reservation of rights; (2) efforts or measures taken by the insurer to resolve the coverage dispute promptly or in such a way to limit any potential prejudice to the insured; (3) the substance of the coverage dispute or the weight of legal authority on the coverage issue; (4) the insurer's diligence and thoroughness in investigating the facts specifically pertinent to coverage; and (5) efforts made by the insurer to settle the liability claim in the face of the coverage dispute.[67]

The Court has considered Plaintiffs' arguments relating to the *Robinson* factors and has found them to be unpersuasive.[68]  In fact, the record demonstrates that CICW took steps to

---

[65]583 So.2d 1063 (Fla. Dist. App. 1991).

[66]261 Kan. 806, 846, 934 P.2d 65, 90 (1997).

[67]*Id.* at 846, 934 P.2d at 90.

[68]*See* Doc. 49, pp. 14-15.  The Court also finds no evidence or testimony during the July 18, 2007 trial on the issue of CICW's bad faith in defending Shawnee County.

ensure that it followed Kansas law by hiring outside counsel familiar with Kansas' requirements for investigating insurance claims.  Mr. Seuferer admitted that he was not an expert on Kansas law.  Instead of investigating the claims himself, he hired outside counsel to act on CICW's behalf to conduct the investigation and render an opinion.[69]  CICW had used Mr. Manz in the past for evaluating other claims, and it was comfortable with Mr. Manz' abilities to reach conclusions based on Kansas law.[70]  Contrary to Plaintiffs' assertions, CICW looked beyond the pleadings when investigating the claims,[71] and the record provides no indication of bad faith on the part of CICW.  Instead, the record demonstrates CICW's good faith attempt to assess the facts surrounding the incident and the claims asserted against Shawnee County to determine coverage.  Although CICW did not specifically review the steps taken during Mr. Manz' investigation, CICW did review and approve Mr. Manz' letter denying coverage and defense prior to it being sent to Shawnee County.[72]  While Plaintiffs contend that CICW was required to conduct an investigation separate from that conducted by Mr. Manz, who was hired by CICW to perform this specific task on CICW's behalf, they have provided, and this Court has found, no Kansas authority requiring CICW to do so.  Moreover, the record indicates that both Shawnee County and Plaintiffs were aware of CICW's reasons for declining coverage, and no party stepped forward to provide useful information to assist CICW in reevaluating its decision.  The

---

[69]Doc. 52-10, pp. 15-16.  Section I, Coverages, of the insurance contract sets forth CICW's authority to investigate any claim or suit, at its discretion, to determine if insurance coverage applies to the claim so as to implicate CICW's duty to defend.

[70]Doc. 52-10, pp. 17-18.

[71]*See* Doc. 47-5; Doc. 51-3.

[72]Doc. 52-10, pp. 17-18.  CICW hired Mr. Manz rather than complete the investigation itself because it was not familiar with the proper requirements for evaluating a claim under Kansas Law.

first document that actually contained language asserting that Shawnee County might be liable

for L.P.'s negligence was Plaintiffs' proposed journal entry of judgment, which was incorporated

into the party's December 6, 2006 proposed Assignment of Rights and Covenant Not-to-

Execute.[73]  In conformity with that agreement, neither Plaintiffs nor Shawnee County provided

those documents to CICW.[74]

CICW's December 8, 2006 response in which it expressed its willingness to re-evaluate

its previous coverage decision went unanswered by Shawnee County until June 17, 2007, one

month before trial was scheduled to commence, at which point Shawnee County provided CICW

with a copy of Plaintiffs' second amended petition.  Shawnee County also attached a copy of its

answer to the second amended petition, which it filed on June 11, 2007.  While the Court notes

that the second amended petition was not filed until May 22, 2007, neither Plaintiffs nor

Shawnee County communicated with CICW between CICW's December 8, 2006 letter and

Shawnee County's June 15, 2007 request for defense regarding any claims against Shawnee

County.  Moreover, upon receiving Plaintiffs' second amended petition, Shawnee County failed

to forward it to CICW for review, which CICW had previously requested, but instead chose to

file its own answer to the petition without requesting or receiving CICW's input.  Four days after

filing its answer, Shawnee County forwarded the petition to CICW and once again requested

coverage and a defense.[75]  Upon CICW receiving additional information from Shawnee County

---

[73]Doc. 52-15, p. 91.

[74]Doc. 52-15, p. 91.

[75]Doc. 47-11, p. 14; Doc. 47-17, p. 48.

in June 2007, it reevaluated its position and offered to defend under reservation of rights.[76]  As discussed below, Shawnee County subsequently resisted CICW's offer to defend on the grounds that it was too late.

The facts clearly demonstrate that CICW looked beyond the pleadings to determine coverage, and therefore, Plaintiffs' claim that CICW "conducted no investigation" and acted in bad faith in its denial of coverage is unsupported.  Further, Plaintiffs' argument that CICW should have filed a declaratory judgment action or simply called Plaintiffs' counsel to ask about the claim is disingenuous. Accordingly, the Court does not find that CICW's denial of coverage and a defense was the result of bad faith.

Further, even if CICW had acted in bad faith in denying Shawnee County's request for coverage, the refusal to defend was not a factor in the excess judgment.  An insurer is not liable for an excess judgment absent a showing that the excess judgment is traceable to an insurer's bad faith refusal to defend.[77]  Excess judgment liability depends on the circumstances of each particular case and cannot be determined on the basis of any general statement or definition.[78]

In the instant action, Shawnee County was represented by competent counsel from the time Plaintiffs provided notice of their claim up to and including trial.  James Crowl, Assistant Shawnee County Counselor, was experienced in civil litigation, and was prepared to defend this action if CICW did not defend the case on Shawnee County's behalf.[79]  In fact, Mr. Crowl was

---

[76]Doc. 47-17, pp. 59-66.  An insurer does not breach its duty to defend by defending an action under a reservation of rights.  *Ramsey*, 32 Kan. App. 2d at 1158, 95 P.3d at 1041.

[77]*Snodgrass*, 15 Kan. App. 2d at 164, 804 P.2d at 1021; *see also Americold Corp.*, 261 Kan. at 849, 934 P.2d at 92.

[78]*Snodgrass*, 15 Kan. App. 2d at 167, 804 P.2d at 1023.

[79]Doc. 52-15, pp. 6-8, 52, 81-82.

involved in this action from its inception, addressing correspondence between the County and Plaintiffs, and also answered Plaintiffs' second amended petition in which he set forth numerous affirmative defenses to Plaintiffs' claims.[80]  Mr. Crowl addressed Plaintiffs' only settlement offer, submitted to Shawnee County in May 2006, which Shawnee County declined to accept. Shawnee County did not present Plaintiffs' May 2006 offer to CICW prior to its expiration.[81]

The theory behind the position holding an insurer liable for excess judgment is "that by refusing a settlement offer, the insurer is causing a discernible injury to the insured.  A refusal to defend, in itself, can be compensated for by paying the costs incurred in the insured's defense. But when a settlement offer is also rejected, the injury to the insured is traceable to the insurer's breach. . . .  Absent a settlement offer, the plain refusal to defend has no causal connection with the amount of a judgment in excess of the policy limits.  If the insured has employed competent counsel to represent him, there is no basis for concluding that the judgment would have been for a lesser sum had the defense been conducted by insurer's counsel."[82]  As there were no settlement offers within policy limits for CICW to consider, there is no basis to conclude that a judgment would have been for a lesser sum had CICW defended Shawnee County at trial rather than Shawnee County's counselors, who represented Shawnee County throughout the entire litigation.  Accordingly, the Court finds no link between the excess judgment and CICW's refusal to defend so as to implicate liability on CICW for the excess judgment.

---

[80]Doc. 46-3.  As mentioned below, Shawnee County did not file an answer to Plaintiffs' initial petition or first amended petition.  The Court also notes that Richard V. Eckert, another Shawnee County Counselor, was at times involved in this litigation.

[81]Doc. 52-15, p. 55.

[82]*Snodgrass*, 15 Kan. App. 2d at 165, 804 P.2d at 1011 (quoting *George R. Winchell, Inc. v. Norris*, 6 Kan. App. 2d 725, 728-29, 633 P.2d 1174, 1177-78 (1981)).

B.      Collusion

CICW asserts that the judgment rendered in the state court is collusive and unreasonable, and as a result, it is unenforceable against CICW in this garnishment action.  CICW argues that the judgment was collusive and unreasonable because Shawnee County and Plaintiffs agreed to a settlement that was essentially a consent judgment rubber-stamped by the state judge without regard to the Kansas Tort Claims Act (KTCA) and the limits imposed by Kansas law.  In addition, CICW contends that, as part of the December Assignment of Rights and Covenant Not-to-Execute, Plaintiffs and Shawnee County agreed to join together and not cooperate with CICW, and further, agreed to oppose any attempt by CICW to intervene in the action.  Plaintiffs and Shawnee County also agreed to keep the agreement strictly confidential.  Plaintiffs respond that the judgment was not collusive or unreasonable because the state court rendered its decision based on the evidence presented at trial, and accordingly, it is not a consent judgment between the parties.  Plaintiffs also deny any agreement with Shawnee County as to the amount of the judgment.  Accordingly, Plaintiffs assert that CICW is liable for the state court judgment.

 On December 5, 2006, Shawnee County notified CICW of Plaintiffs' counsels' belief that Shawnee County would be held responsible for L.P.'s negligence and also provided CICW with Plaintiffs' motion to add additional Plaintiffs.  The next day, Plaintiffs submitted to Shawnee County a proposal to enter into a Covenant Not-to-Execute and a proposed journal entry of judgment that required Shawnee County to not cooperate with CICW and to oppose any attempt by CICW to intervene or participate in the litigation.[83]  Neither Shawnee County nor Plaintiffs provided CICW with a copy of the Covenant Not-to-Execute or the proposed journal

---

[83]Doc. 47-17, pp. 27-31.

entry of judgment.[84]  Two days later, CICW notified Shawnee County by letter, dated December

8, 2006, that it was willing to re-evaluate its previous coverage decision if Shawnee County

would send it Plaintiffs' amended petition.   Plaintiffs did not file its second amended petition

adding the additional Plaintiffs until over five months later, and therefore, Shawnee County did

not communicate with CICW until June 15, 2007, at which point it provided a copy of the

amended petition, its answer to the petition, and once again requested coverage and defense.

    After reviewing Shawnee County's June 15 response and Plaintiffs' second amended

petition, CICW offered to defend Shawnee County under a reservation of rights, and retained

Richard Honeyman to defend the action.[85]  Before responding to CICW, Mr. Crowl, representing

Shawnee County, attended the July 2, 2007 pretrial conference.  Prior to appearing at the pretrial

conference, Shawnee County was aware that Mr. Honeyman had been attempting to contact it,

but Shawnee County made no attempt to communicate with Mr. Honeyman prior to the pretrial

conference.[86]  During the pretrial conference and consistent with the Covenant Not-to-Execute

and proposed journal entry of judgment, Shawnee County made no objection to any of Plaintiffs'

motion to add a party, Plaintiffs' motion to pre-admit exhibits, or Plaintiffs' possible admission

of two additional exhibits.  In addition, Shawnee County withdrew its request for summary

judgment, its request for additional time for discovery, its request for jury trial, and its request to

file a motion in limine.[87]  After the pretrial conference and still prior to receiving any response

---

[84]Doc. 52-15, p. 88.

[85]Doc. 47-17, pp. 59-66.

[86]Mr. Seuferer testified in his deposition that "Mr. Honeyman contacted us either the night, . . . late afternoon before or the morning of [the pretrial conference]."  Doc. 52-15, p. 110.

[87]Doc. 2-2, p. 3.

from Shawnee County on its offer to defend, on July 3, 2007, CICW sent notice to Shawnee

County that CICW had learned of the proposed Covenant Not-to-Execute and expressed its

objections to Shawnee County entering into any agreement with Plaintiffs or waiving any

defenses.[88]  The County subsequently declined CICW's offer to defend because it formed the

opinion that the offer to defend the action was "no longer necessary" because the County had

accepted and agreed to the Covenant Not-to-Execute.[89]

A judgment is generally subject to collateral attack only if it is void;[90] however, an

insurer may challenge a settlement or non-jury judgment in a garnishment action against the

insurer to enforce the insurance contract.[91]  Initially, the insured has the burden of demonstrating

prima facie that the amount of settlement was reasonable and entered into in good faith.  Once

the insured meets this burden, the insurer must then ultimately prove that the settlement was

made in bad faith or the amount was unreasonable.[92]  "This rule reasonably accommodates and

compromises the competing interests of the parties and considerations of public policy.  It will

discourage collusive or overreaching impositions upon insurance carriers and, at the same time,

will be conducive toward encouraging settlement and protecting an insured in its efforts

amicably to resolve a claim against it after having been abandoned by its carrier."[93]

---

[88]Doc. 47-17, pp. 67-70.

[89]Doc. 52-15, p. 118-19; *see also* Doc. 47-17, p. 71; Doc. 52-15, p. 112.  The approved Covenant Not-to-Execute no longer contained language requiring Shawnee County to resist any attempt by CICW to participate in the litigation.

[90]*Crist*, 277 Kan. at 718, 89 P.3d at 581 (citation omitted).

[91]*Glenn*, 247 Kan. at 318, 799 P.2d at 93.

[92]*Id.*

[93]*Id.*

Plaintiffs have the burden of making a prima facie case that the settlement was entered into in good faith and that the amount was reasonable.  Plaintiffs contend that there was no settlement between themselves and Shawnee County, and the final judgment resulted from a trial on the merits.  Plaintiffs also point out that the trial judge found the damages awarded were "appropriate" based on the evidence presented at trial.[94]

Although the Kansas Supreme Court has approved the use of prejudgment covenants not-to-execute, it has expressed "concern over the reasonableness of assignment/covenants in which the amount of the judgment assigned has been determined by agreement of the parties" and may not represent an "arms-length determination of the value of the Plaintiffs claim."[95]  It has further questioned whether a judgment can be deemed reasonable when the amount has been determined by agreement of the parties, which is essentially what happened in this case.[96]  The Covenant Not-to-Execute entered into between Plaintiffs and Shawnee County effectively removed any conflicting interest between them, and consequently, any bargaining between the parties that would ensure a reasonable settlement amount.[97]  Shawnee County no longer had the incentive to dispute liability or amount of damages, and in fact, its interests were best served by agreeing to Plaintiffs' proposals, no matter the amount.[98]  Consistent with their Covenant Not-to-Execute, Plaintiffs drafted a journal entry of judgment that identified the evidence Plaintiffs would present

---

[94]*See* Doc. 52, p. 24.

[95]*Glenn*, 247 Kan. at 318, 799 P.2d at 92.

[96]*Id.* at 317-18, 799 P.2d at 92.

[97]*See* Doc. 52-15, pp. 117, 125, 130-31.  In fact, there is no suggestion in the record that either party to the agreement negotiated on damages.

[98]*See* Doc. 52-15, p. 131.

and indicated that Shawnee County would present no evidence.  Further, the journal entry

identified the findings of the court, detailed the amounts of liability by category, then determined

the final judgment amount based on the percentage of each party's fault.[99]  Prior to trial, Mr.

Crowl signed this draft approving the journal entry on behalf of Shawnee County, which

included the amount of judgment.[100]

   While every agreement involves some form of cooperation between the parties, an

agreement becomes collusive "when the purpose is to injure the interests of an absent or

nonparticipating party, such as an insurer or non-settling defendant."[101]  Plaintiffs first proposal

to Shawnee County included a provision to not cooperate with CICW and to join with Plaintiffs

to oppose CICW's attempts to intervene or defend the action.[102]  Although Shawnee County

ultimately declined to accept Plaintiffs' December proposal, taking the position that it would not

pay additional money,[103] Plaintiffs' and Shawnee County's conduct remained consistent with the

remaining conditions of the agreement.[104]  The judgment amount in the agreed pre-trial journal

---

[99]Doc. 2-4, pp. 12-25.  The amount of judgment was also essentially stipulated to by the parties through trial exhibit 29, which the court adopted as "appropriate damages" minus personal injury damages that Plaintiffs withdrew at start of trial.  Doc. 53-4.

[100]Doc. 2-4, p. 25.

[101]*Continental Cas. Co. v. Hempel*, 4 Fed. Appx. 703, 717 (10th Cir. 2001); *see also Dickerman v. Northern Trust Co.*, 176 U.S. 181, 189-90 (1900).

[102]Doc. 47-17.

[103]Doc. 52-15, pp. 99-100.  Mr. Crowl testified in his deposition that Shawnee County would consider an Assignment of Rights and Covenant Not-to-Execute if there were no additional tax monies included in the agreement.  Doc. 52-15, p. 100.  The Court also notes that the final Assignment of Rights and Covenant Not-to-Execute did not include the provision requiring the parties to oppose CICW's attempt to participate; however, the parties decision to exclude this provision does not absolve them of their conduct.

[104]The Court also takes notice of both Plaintiffs' and Shawnee County's lack of action during the state court proceeding, further indicating the proceeding was not a genuine adversarial proceeding.  Shawnee County failed to file an answer to either of Plaintiffs' initial Petition or First Amended Petition, and Plaintiffs did not move to take default judgment against Shawnee County.  Doc. 2-2, p. 29.

entry of judgment failed to take into consideration the settlement reached with L.P.'s and

account for the money previously paid to Plaintiffs.  In addition, the trial record lacks any

indication of the settlement between Plaintiffs and L.P.'s so as to have permitted the trial court to

factor in the money paid to Plaintiffs on behalf of L.P.'s to reach a reasonable judgment

amount.[105]  Therefore, because the parties agreed to a judgment amount that failed to take into

account any prior settlement, and because the judgment did not take the previous settlement

payments into consideration, the judgment amount is unreasonable as a matter of law.[106]

Further, and even more disturbing to this Court, is Plaintiffs' and Shawnee County's

response to the trial judge's inquiry concerning CICW's involvement in the action.  Specifically,

the following dialogue took place at the close of trial:

> The Court: And I also, for the record, state that we checked this morning and
> there was no entry of an appearance or any request by the insurance company to
> become involved in this action, as far as the Court or counsel are aware of; is that
> correct, gentleman?
>
> Mr. Crowl: That's correct.
>
> Mr. Leatherman: Yes.  That's correct, Your Honor.[107]

Counsel was aware that CICW had offered to defend Shawnee County in the action under

reservation of rights, and further, Mr. Crowl was specifically aware that CICW had raised

objections to the parties' entering into the Covenant Not-to-Execute and to Shawnee County's

---

[105]Plaintiffs settled with L.P.'s for its negligence in this action for $855,500.10.

[106]The purpose of awarding damages is to make the injured party whole by restoring that party to the position he or she was in prior to the injury. *Samsel v. Wheeler Transport Svcs., Inc.*, 246 Kan. 336, 789 P.2d 541 (1990), *overruled in part on other grounds* 248 Kan. 824, 844, 811 P.2d 1176 (1991).  Damages are not allowed, however, which grant a windfall. *Service Iron Foundry, Inc. v. M.A. Bell Co.*, 2 Kan. App. 2d 662, 679, 588 P.2d 463 (1978).

[107]Doc. 47-15, pp. 123-24.

-29-

intent on waiving any and all defenses to the action at trial.  Mr. Crowl also had communications with CICW and Mr. Honeyman regarding CICW's readiness to defend, which Mr. Crowl refused.  The trial court obviously had due process concerns, and it was counsels' responsibility to make the court aware of CICW's objections and request to defend Shawnee County prior to trial.  In light of these facts, counsels' response to the trial court's inquiry was misleading.

This exclusion, along with all other factors previously discussed, compel a conclusion that the judgment is collusive, and as such, unreasonable.

### C.      Estoppel

Plaintiffs argue that because CICW failed to defend Shawnee County in the July 2007 trial, it is collaterally estopped from challenging the judgment.  However, as previously discussed, an insurer may challenge a settlement or non-jury verdict judgment in a garnishment action against the insurer to enforce the insurance contract.[108]  In this case, CICW is not seeking a review of the actual matter decided in state court.  Rather than seeking to re-litigate liability with regard to Shawnee County, CICW's arguments here apply as to whether it has the duty to indemnify Shawnee County.  Accordingly, a judgment that remains valid against Shawnee County is not inconsistent with the Court's conclusion that CICW is not responsible for the judgment.

### D.      Attorney's Fees

CICW requests attorneys' fees and costs pursuant to K.S.A. § 60-721 and 28 U.S.C. § 1927, claiming that Plaintiffs controverted CICW's garnishment answer without good cause and without any factual or legal basis.  In addition, CICW asserts that Plaintiffs motion for partial

---

[108]*Glenn*, 247 Kan. at 318, 799 P.2d at 93.

summary judgment was without merit, and was filed for the sole purpose of vexatiously multiplying the proceedings.  CICW also argues that Plaintiffs violated Fed. R. Civ. P. 36 and 37(c)(2) by unreasonably refusing to admit matters during discovery.  Plaintiffs responded by arguing that they acted in good faith because their claim was in response to and supported by a state court judgment.  Further, Plaintiffs contend four of their seven total filed pleadings in this case were responses or replies to CICW's motions and were not frivolous so as to vexatiously multiply the proceedings.  Lastly, Plaintiffs assert that they failed to admit due to language used in the request for admission, and certain interrogatories were objectionable as attorney work product.

### 1. Controverting answer without cause

Kansas law provides that if a party controverts a garnishee's answer without good cause, a court may award the garnishee its reasonable attorneys' fees and expenses in proving its answer.[109]  "Without good cause" is the equivalent of "without just cause or excuse," and means "frivolous, unfounded, and 'patently without any reasonable foundation.'"[110] The assessment of costs and attorneys fees rests within the discretion of the court.[111]

In controverting CICW's answer, Plaintiffs asserted, among other contentions, that CICW was liable for the state court judgment against Shawnee County because of the independent findings of the state court judge, and therefore, its claim that it owed or held no

---

[109]K.S.A. § 60-721(a)(5).

[110]*Fletcher v. Anderson*, 29 Kan. App. 2d 784, 786, 31 P.3d 313, 315 (2001) (internal citations omitted).

[111]*Id.*

money on behalf of Shawnee County was erroneous.[112]  Although this Court has granted Defendant's motion for summary judgment, the Court nonetheless concludes that Plaintiffs' challenge to CICW's answer does not arise to the level of being completely frivolous, unfounded, and patently without any reasonable foundation so as to warrant awarding attorneys' fees and costs.   Plaintiffs controverted CICW's garnishment answer in an attempt to enforce the state court's judgment, and accordingly, was sufficiently reasonable so as to preclude the award of costs and attorneys' fees.

### 2.  Counsel's liability for excessive costs

A court may award attorneys' fees and costs to a party when an attorney "unreasonably and vexatiously" multiplies the proceedings in a case.[113]  An attorney's actions under 28 U.S.C. § 1927 are vexatious and unreasonable if the attorney acted in bad faith.[114]  The power of a court to impose costs under this section "must be strictly construed and utilized only in instances evidencing a 'serious and standard disregard for the orderly process of justice.'"[115]

CICW has not persuaded the Court that Plaintiffs' counsel acted in a vexatious and unreasonable manner regarding the case before this Court.  The number of pleadings filed is within the limits of reasonableness, and there is no indication that Plaintiffs' counsel has filed any pleading in bad faith or to harass or abuse CICW or the judicial process; therefore, the Court finds that awarding attorneys' fees and costs under § 1927 would be inappropriate and denies

---

[112]Doc. 23.

[113]28 U.S.C. § 1927.

[114]*Dreiling v. Peugeot Motors of Am. Inc.*, 768 F.2d 1159, 1165 (10th Cir. 1985).

[115]*Id.* (quoting *Kietel v. Las Vegas Hacienda, Inc.*, 404 F.2d 1163, 1167 (7th Cir. 1968) *cert. denied*, 365 U.S. 908 (1969)).

CICW's request.

### 3.  Failure to Admit

When responding to a party's request for admission, the answering party must admit, specifically deny, or state in detail why the request cannot be truthfully admitted or denied.[116]  A denial "must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest."[117]  Absent falling within one of the rule's enumerated exceptions, an answering party failing to admit a request for admission that is subsequently proven to be true shall pay the reasonable expenses, which includes attorneys' fees, of the requesting party in proving the matter true.[118]

CICW submitted to Plaintiffs a request for admission regarding a previous settlement payment made by CICW to Plaintiffs on L.P.'s behalf.  Specifically, the submission requested Plaintiffs admit or deny that "Garnishee [CICW] paid plaintiffs $800,000.00 to settle the liability of L.P.'s Excavating, Inc. for the events described in the journal entry of judgment entered on July 18, 2007."[119]  Plaintiffs denied the request for admission.

It is indisputable that Plaintiffs were aware of the settlement reached between themselves and L.P.'s, and that Plaintiffs had been paid $855,500.10 by the time CICW propounded to

---

[116]Fed. R. Civ. P. 36(a)(4).

[117]*Id.*

[118]Fed. R. Civ. P. 37(c)(2).  The court must order payment of reasonable expenses unless: the request was held objectionable under Rule 36(a); the admission sought was of no substantial importance; the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or the was other good reason for the failure to admit.  Fed. R. Civ. P. 37(c)(2)(A)-(D).

[119]Doc. 41-2, p. 2 ¶ 6.

Plaintiffs the request for admission.[120]  Plaintiffs' denial of this request is indefensible, and

Plaintiffs' reasoning that it did so because the request "did not contain the modifier 'more than'"

and because CICW misstated the settlement amount is unpersuasive.  At the very least, good

faith required Plaintiffs to qualify their denial rather than, as they have done in this instance,

flatly deny the request while being full aware of the settlement amount.  Accordingly, because no

exception applies[121] and because no reasonable excuse exists for Plaintiffs conduct, the Court

concludes that Plaintiffs are liable for CICW's reasonable expenses, including attorneys' fees, in

proving this request for admission.

Accordingly,

IT IS THEREFORE ORDERED that Garnishee's Motion for Summary Judgment (Doc.

47) is hereby Granted.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. 48) is

Denied.

IT IS FURTHER ORDERED that  Garnishee's Motion to Assess Attorney's Fees (Doc.

41) is Granted in part and Denied in part.  Garnishee shall have thirty (30) days from the date of

this Order to file with the Court its reasonable expenses incurred in proving its request for

admission as discussed in this Order.  Plaintiffs shall have 14 days from the date of Garnishee's

filing to respond.

IT IS SO ORDERED.

---

[120]Doc. 32-4.

[121]Objections to a request must be stated, and Plaintiffs made no objections to this request.  Fed. R. Civ. P. 36(a)(5).  The Court cannot conclude that the request was of no substantial importance as the foundation of this action regards CICW's liability of payment for damages Plaintiffs sustained, and Plaintiffs have provided no reasonable explanation or excuse for failing to admit the request.

Dated this 12th day of January, 2009, in Wichita, Kansas.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE